Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Aug 15 2014, 7:24 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT B.T.:

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEY FOR APPELLANT D.D.:

**AMY KAROZOS**
Greenwood, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**DAVID E. COREY**
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: D.D. (Minor Child) and<br><br>B.T. (Mother) and D.D. (Father),<br><br>    Appellants-Respondents,<br><br>        vs.<br><br>INDIANA DEPARTMENT OF CHILD SERVICES,<br><br>    Appellee-Petitioner. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 49A02-1312-JT-1027<br>)<br>)<br>)<br>)<br>)<br>) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Gary Chavers, Judge Pro Tempore
The Honorable Larry Bradley, Magistrate
Cause No. 49D09-1305-JT-16005

**August 15, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

B.T. ("Mother") and D.D. ("Father") each appeal the involuntary termination of their parental rights to their minor daughter, D.D.  We affirm.

**Facts and Procedural History**

In its termination order, dated November 14, 2013, the trial court made the following relevant findings of fact:[1]

1.      Mother is the mother, and Father is the father, of D.D., a minor child born on June 27, 2008.

2.      A Child in Need of Services Petition "C[H]INS" was filed on D.D. on January 10, 2011, under Cause Number 49D091101JC001073 after her mother was arrested for Battery on another woman.  Father had not established paternity, and there were concerns whether he could safely and appropriately parent D.D. given his criminal history.

3.      At the Initial Hearing held on January 10, 2011, D.D. was ordered detained and placed outside the home in relative care.

4.      D.D. was found to be in need of services as to her mother on March 8, 2011, after Mother admitted that she failed to provide D.D. with a safe and appropriate home after being involved in a physical altercation at which time D.D. was present and injured.

5.      Disposition was held on Mother on April 19, 2011, at which time D.D. was formally removed from her mother.  She had been removed for at least six (6) months prior to this termination action being filed on May 8, 2013.

6.      D.D. was found to be in need of services as to her father on July 26, 2011, after he admitted to allegations that he had not established paternity and due to his inability to protect D.D. from injury and concerns of his history of domestic violence.

---

[1] We note that the trial court refers to the parties by their full names.  We use "Father," "Mother," and "D.D." where appropriate.

2

7.     On August 9, 2011, a Disposition Hearing was held as to Father at which time D.D. was formally removed from him.  She had been removed for at least six (6) months prior to this termination action being filed on May 8, 2013.

8.     D.D. had been removed from the home and placed under the care and supervision of the IDCSMC[2] for at least fifteen (15) of the most recent twenty-two (22) months prior to May 8, 2013.

9.     Although Mother initially testified that the only services ordered [were] domestic violence classes, services ordered included home based therapy and case management, a psychological evaluation and recommendation follow up, and a drug and alcohol assessment and recommendation follow up, and a parenting assessment.

10.     Mother failed to undergo a parenting assessment.

11.     Mother participated in home based therapy through Branches of Life between February of 2012 and May or June of 2013, at which time she did complete her domestic violence classes.  Other goals included anger management and parenting.

12.     Although Mother was initially consistent in meeting with her therapist, she developed a pattern of missing several weeks of sessions before meeting again.  This service was closed out unsuccessful due to Mother having stopped the meetings.

13.     At the time therapy was closed, the therapist had concerns of placing D.D. in her mother's care due to not following through with services including a drug and alcohol program, and due to poor rash decision making skills.

14.     Mother demonstrated an inability or unwillingness to follow through with applying for social security and with job applications.

15.     Mother is currently not working at her dancing job due to pregnancy.  She lives with her grandfather who supports her.  She received Medicaid after becoming pregnant and receives food stamps.

16.     Altogether, Mother was unsuccessful in ten home based service referrals.

---

2 The Indiana Department of Child Services, Marion County

3

17. Two referrals were made for a drug and alcohol assessment. Mother attended neither.

18. Two referrals for panels of random drug tests were made. Mother attended one screen in April of 2013, at which time she tested positive for THC and Cocaine.

19. Mother did complete a psychological evaluation which diagnosed her with Bi-Polar Disorder and having a learning disability.

20. Mother was also evaluated at Midtown Mental Health Clinic in August of 2012, at which time she presented with Major Depression Disorder, recurrent and moderate. Mother was given a drug test at this evaluation and she tested positive for Cocaine, Benzodiazepine, Opiates, and Marijuana.

21. As a result of the positive drug test in August of 2012, Mother was referred to a dual diagnosis program to address substance abuse and her mental health issues.

22. Mother was discharged from all programs at Midtown for not following up with treatment.

23. Mother is not taking prescribed medications for her mental health diagnosis. She presented to her home based provider as depressed and being tired, at times remaining in bed. Mother represented to a provider that she does not like the way the medications make her feel and would not consider taking them.

24. The importance of completing services to reunify D.D. into a safe and stable home was stressed to Mother by service providers at team meetings.

25. The last visit between Mother and D.D. occurred in July 2013. Mother was not always consistent in attending visits or being on time. Visits were suspended by the C[H]INS Court because of the inconsistency and also inappropriate conversations with D.D., confusing D.D. and not in her best interests.

26. D.D. intensely acted out when visits did not occur.

27. Father was ordered to successfully complete home based counseling, a domestic violence assessment and follow recommendations, a substance

4

abuse assessment and follow recommendations, a parenting assessment, a psychological evaluation, and random urine screens.

28. Father failed to successfully complete any service except all his random drug screens which were negative.

29. Father completed a Families and Fathers program.

30. A psychological evaluation was never referred.

31. Father received one hundred and ninety days of executed incarceration days, stemming from seven convictions, since the initiation of D.D.'s C[H]INS case.

32. Father has fourteen more convictions, including convictions for Domestic Violence and Invasion of Privacy.

33. Father had two referrals for visitation with D.D. Both were suspended due to non-compliance. His last visit was prior to 2013. He requested a visit in May of 2013, after D.D.'s permanency plan was changed to adoption.

34. Father failed to remain in contact with his family case manager, and was somewhat inconsistent in attending C[H]INS hearings, including one Permanency Hearing.

35. Father has a stable home with his girlfriend, and has employment which may or may not be full-time. His fifteen and six year old sons reside with him.

36. Four Permanency Hearings were held in the C[H]INS case between July 24, 2012 and May 7, 2013, the date the permanency plan was changed to adoption at which time the Court noted that the parents could continue in services but at their own expense.

37. After close to three years, parents had not come to the point where unsupervised visits were offered.

38. D.D. is placed in [a] pre-adoptive foster care home where she has resided since December of 2012.

39. D.D. suffers from Reactive Attachment Disorder with Anxiety. Due to therapy, assurances, stability and structure, D.D. is making progress.

5

40. D.D. has developed a bond with her foster family and has voiced her desire to become a member of the family to her Guardian ad Litem.

41. A bond was observed between D.D. and her mother during visits, but became less so over time.

42. D.D. does not mention or ask about her father when with the family case manager or Guardian ad Litem. She thinks of someone other than Father as her father now.

….

49. Based on, in part, D.D.'s progress in her behavior and her need for stability and permanency, Family Case Manager Julie Harris believes that adoption is in D.D.'s best interests.

50. Due to neither parent demonstrating the willingness to complete services and showing they can parent in a safe and stable way, and the child's wishes and special needs, Guardian ad Litem Patti Cavanaugh recommends adoption as the permanency plan for D.D.

Father's App. at 15-19.

Based upon these findings of fact, the trial court concluded that: (1) there is a reasonable probability that the conditions that resulted in the removal of D.D. and her continued placement outside the home will not be remedied by either Mother or Father; (2) there is a reasonable probability that the continuation of the parent-child relationship between D.D. and both Mother and Father poses a threat to the well-being of D.D.; (3) termination of the parent-child relationship between both parents and D.D. is in the best interests of D.D.; and (4) DCS has a satisfactory plan for the care and treatment of D.D., which is adoption. Accordingly, the trial court determined that the DCS had proven the allegations of the petition to terminate parental rights by clear and convincing evidence

and therefore terminated Mother's and Father's parental rights. Both parents appeal. Additional facts will be provided as necessary.

## Discussion and Decision

"The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). Indeed, parental interests "must be subordinated to the child's interests" in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009).

Indiana Code Section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following relevant requirements:

(2) The petition must allege:

(A) that one (1) of the following is true:

> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

7

(B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the   parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove "each and every element" by clear and convincing evidence.  *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2.  If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a).

We have long had a highly deferential standard of review in cases involving the termination of parental rights.  *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011).  We neither reweigh the evidence nor assess witness credibility.  *Id*.  We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id*.  Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review:  we first determine whether the evidence supports the findings and then determine whether the findings support the judgment.  *Id*.  In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.  *Id*.  Clear error is that which "leaves us

with a definite and firm conviction that a mistake has been made." *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied.*

Mother and Father filed separate briefs on appeal, raising some of the same and some different legal challenges. Mother and Father both assert that the trial court abused its discretion in excluding certain evidence during the termination hearing. They also both challenge the sufficiency of the evidence to support the trial court's conclusions that there is a reasonable probability that the conditions that resulted in D.D.'s removal and continued placement outside the home will not be remedied by either parent and that the continuation of the parent-child relationship between both parents and D.D. poses a threat to D.D.'s well-being. Mother alone challenges the trial court's conclusions that termination of her parental rights is in D.D.'s best interests and that DCS has a satisfactory plan for the care and treatment of D.D.[3] We address these arguments in turn.

**Section 1 – Exclusion of Testimony**

Mother and Father both assert that the trial court abused its discretion in excluding certain evidence during the termination hearing. The admission of evidence is entrusted to the sound discretion of the trial court. *K.L. v. E.H.*, 6 N.E.3d 1021, 1030 (Ind. Ct. App. 2014). Accordingly, evidentiary rulings of a trial court are afforded great deference on appeal and are overturned only for a showing of an abuse of discretion. *In re S.L.H.S*, 885 N.E.2d 603, 614 (Ind. Ct. App. 2008). "We will find an abuse of discretion if the

---

[3] Father does not specifically challenge the trial court's conclusions that termination of his parental rights is in D.D.'s best interests or that DCS has a satisfactory plan for D.D.'s care and treatment, so we will not address those conclusions as pertaining to Father. Likewise, as neither parent disputes that D.D. has been removed from their care for at least six months under a dispositional decree as required by Indiana Code Section 31-35-2-4(b)(2)(A), we need not consider the sufficiency of the evidence regarding that statutory factor.

trial court's decision is against the logic and effect of the facts and circumstances before the court." *Id.* If a trial court abuses its discretion in making an evidentiary ruling, we will reverse only if the trial court's error is inconsistent with substantial justice or if a substantial right of the party is affected. *K.L.*, 6 N.E. 3d at 1030; s*ee* Ind. Evidence Rule 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected.").

We initially note that Father frames his evidentiary argument as a denial of due process rights. However, as Father never raised a due process claim at the trial level, he has waived his constitutional challenge with respect to the termination proceedings. *See McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 195 (Ind. Ct. App. 2003) (a parent waives a due process claim by raising it for the first time on appeal). Moreover, as Father neither joined in Mother's objections to the trial court's exclusion of the testimony nor tried to elicit similar testimony from witnesses, Father acquiesced to the trial court's exclusion of the evidence and cannot now challenge the trial court's decision. *See Reed v. Dillon*, 566 N.E.2d 585, 588 (Ind. Ct. App. 1991) ("In failing to make a timely objection or motion, the party is in effect, acquiescing in the admission" or exclusion of the evidence.). Accordingly, we will address this issue solely with respect to Mother's arguments.

Mother contends that the trial court abused its discretion "in excluding on relevancy grounds evidence relating to the ability of Mother and her extended family to provide a safe and stable home for D.D." Mother's Br. at 10. Specifically, during cross-examination of family case manager Harris and guardian ad litem Cavanaugh, Mother

attempted to elicit testimony regarding why DCS had rejected placement of D.D. with her maternal great-grandfather and with Mother's uncle. Mother also attempted to elicit testimony which she argues indicated that D.D.'s reactive attachment disorder was caused by or at least exacerbated by her placement in foster care. DCS repeatedly objected to both lines of questioning on relevancy grounds and the trial court sustained the objections. Mother asserts that the excluded testimony would have established that D.D. has a bond with Mother and her relatives and that they can provide a safe and stable home for D.D.

Relevant evidence is defined as "evidence 'having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Ind. Evidence Rule 401. We agree with the trial court that the testimony that Mother was attempting to elicit regarding placement with D.D.'s great-grandfather and great-uncle was irrelevant to the trial court's consideration of whether there was a reasonable probability that the conditions leading to D.D.'s removal from and continued placement outside Mother's care will not be remedied and whether termination of Mother's parental rights is in D.D.'s best interests. As for Mother's argument that she could have elicited testimony establishing that D.D.'s reactive attachment disorder was caused or worsened by foster care and thus indicative of D.D.'s strong bond with Mother, we are not persuaded that such testimony would have benefitted Mother. In sustaining DCS's objection to the questioning, the trial court explained that D.D.'s placement in foster care was precipitated by Mother's actions, stating, "I guess we can go back and say that the reason why this all

11

started was because of the parents so I don't think that you want to go that far either." Tr. at 277. We agree with the trial court on this issue. Mother has not established that the trial court's decision to sustain DCS's objections to Mother's cross-examination of witnesses was against the logic and effect of the facts and circumstances before the court.

Moreover, even assuming that the trial court improperly excluded any testimony, such error was harmless as there is nothing in the record to suggest that Mother's substantial rights were adversely affected. As discussed more fully below, there was ample evidence supporting the trial court's judgment terminating Mother's parental rights. Thus, Mother has not demonstrated grounds for reversal.

**Section 2 – Reasonable Probability that Conditions will not be Remedied**

Mother and Father both challenge the sufficiency of the evidence to support the trial court's conclusions that there is a reasonable probability that the conditions that resulted in D.D.'s placement outside of their care will not be remedied by either parent and that the continuation of the parent-child relationship between both parents and D.D. poses a threat to D.D.'s well-being. Because our legislature wrote Indiana Code Section 31-35-2-4(b)(2)(B) in the disjunctive, DCS is required to prove either that there is a reasonable probability that the conditions resulting in D.D.'s placement outside of the home will not be remedied *or* that the continuation of the parent-child relationship poses a threat to D.D.'s well-being; we need not address both. *See In re W.B.*, 772 N.E.2d 522, 531 (Ind. Ct. App. 2002).

12

In considering whether there is a reasonable probability that the conditions that led to the removal and continued placement outside the home will not be remedied, we have explained,

> a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. Additionally, a court may consider not only the basis for a child's initial removal from the parent's care, but also any reasons for a child's continued placement away from the parent. The court may also consider the parent's habitual patterns of conduct, as well as evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. Additionally, the court may consider any services offered by the DCS to the parent and the parent's response to those services.

*In re D.K.*, 968 N.E.2d 792, 798 (Ind. Ct. App. 2012) (citations and quotation marks omitted).

Here, D.D. was initially removed from Mother's home because Mother was involved in a physical altercation in the home with another woman during which D.D. was injured. Mother admitted the allegations of the CHINS petition that she failed to provide D.D. with a safe and appropriate home. D.D. was also formally removed from Father's care after Father admitted that he had not established paternity to D.D. prior to DCS involvement with the family, that he was unable to protect D.D., and that there were concerns regarding his criminal history of domestic violence. After removal, D.D. was unsuccessfully placed with two different extended family members, before finally being placed in foster care in December 2012. By the time of the termination hearing, D.D. had been removed from both parents' care for almost three years.

13

Regarding Mother, the record indicates that following D.D.'s initial removal, Mother failed to consistently cooperate with DCS or participate fully in the plethora of services offered to her. As found by the trial court, the importance of completing services in order to reunify D.D. in a safe and stable home was stressed to Mother on multiple occasions. The evidence shows that Mother failed to fully complete homebased therapy, homebased case management, substance abuse and parenting assessments, drug screens, and mental health treatment. As for the few services that Mother did participate in, she was inconsistent in her participation and/or failed to follow through with treatment recommendations. For example, although Mother did participate in one drug screen, she tested positive for THC and cocaine. When she was subsequently evaluated by Midtown Mental Health Clinic, she tested positive for marijuana, cocaine, benzodiazepine, and opiates. Nevertheless, Mother refused to complete a substance abuse assessment or receive treatment for substance abuse issues. Similarly, despite being diagnosed with bipolar disorder and major depression disorder, Mother failed to follow up with treatment and refused to take prescribed medications. The record indicates that throughout the pendency of the CHINS proceeding, Mother was inconsistent in visiting with D.D., and due to inappropriate conversations that Mother was having with D.D. during those visits, visits were ultimately suspended by the trial court.

The foregoing evidence demonstrates Mother's habitual patterns of conduct in failing to consistently participate in services to address the reasons for D.D.'s continued placement outside of Mother's home and supports the trial court's conclusion that there is a reasonable probability that conditions will not be remedied. *See in re L.S.*, 717 N.E.2d

14

204, 208 (Ind. Ct. App. 1999) (appellate court must affirm trial court decision if evidence supports facts that lead to the conclusions of law), *trans. denied* (2000), *cert. denied* (2002). Although Mother points to other evidence which she asserts is favorable to her, her argument is merely an invitation for us to reweigh the evidence, which we cannot do. *See D.B.*, 942 N.E.2d at 871.

We note that Mother also challenges three of the trial court's individual findings of fact as not supported by sufficient evidence. Specifically, Mother challenges findings fourteen, sixteen, and thirty-seven. However, even were we to set aside those findings as erroneous, the numerous unchallenged findings that remain are clearly sufficient to support the trial court's judgment terminating Mother's parental rights, and specifically the court's conclusion that conditions will not be remedied. Accordingly, Mother has not demonstrated grounds for reversal. *See In re B.J.*, 879 N.E.2d 7, 20 (Ind. Ct. App. 2008) (erroneous finding is merely harmless surplusage when additional findings, supported by the evidence in the record, provide sufficient basis for trial court's ultimate conclusion), *trans. denied*.

Regarding Father, although Mother's actions originally caused DCS to remove D.D. from the home, Father's conduct of failing to establish paternity, his admitted inability to protect D.D., and his criminal history of domestic violence supported formal removal from his care as well. Unfortunately for Father, the evidence available to the trial court at the time of the termination hearing indicates that the conditions that led to D.D.'s continued placement outside of his care are not likely to be remedied. During the pendency of the CHINS proceeding, Father was convicted of six different criminal

15

offenses and incarcerated. Father, who was only thirty-three years old at the time of the termination hearing, has a fifteen-year history of numerous misdemeanor and felony convictions, including a conviction for class D felony domestic battery. Father's extensive and recent criminal history does not reflect well on his ability to provide a safe and stable environment for D.D.

Additionally, Father does not challenge the ample evidence in the record regarding his failure to complete any service offered by DCS except for the random drug screens and the Fathers and Families program. Indeed, Father failed to complete homebased counseling, a parenting assessment, a substance abuse assessment, and the domestic violence program.[4] Father similarly does not contest that several services, including supervised visitation with D.D., were discontinued due to his lack of participation and noncompliance, and that this has resulted in D.D. having virtually no memory of or bond with Father. Father blames his three years of noncompliance on DCS for "not keeping up with" him and for him being unable to get in contact with caseworkers. Father's Br. at 11. He argues that the record shows that DCS has never investigated the suitability of his current home for D.D.

While we recognize that a trial court should judge a parent's fitness to care for his child as of the time of the termination proceeding, taking into consideration evidence of changed conditions, as noted above, the trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect

---

[4] Father contends, without citation to authority, that DCS was required to prove that the services that were ordered by the trial court and that he failed to complete were "necessary." Father's Br. at 14. Father has waived this argument. *See* Ind. Appellate Rule 46(A)(8)(a) (requiring contentions in appellant's brief to be supported by cogent reasoning and citations to authorities).

or deprivation. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 152 (Ind. 2005). DCS is not required to rule out all possibilities of change; rather, it need only establish "that there is a reasonable probability that the parent's behavior will not change." *In re Kay L.*. 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). This record is replete with evidence of Father's habitual patterns of poor decisionmaking as evidenced by his extensive criminal history, with several of his crimes being committed during the pendency of the CHINS proceeding. Despite ample and repeated opportunities, Father has failed to demonstrate that he is willing or able to provide a safe and stable home for D.D. Under the circumstances, we cannot say that the trial court clearly erred in concluding that there is a reasonable probability that the conditions leading to D.D.'s continued placement outside of Father's care will not be remedied. As with Mother, Father's arguments to the contrary are invitations for us to reweigh the evidence, which we cannot do. *See D.B.*, 942 N.E.2d at 871.

## Section 3 – Best Interests

Mother maintains that the trial court clearly erred when it concluded that termination of her parental rights is in D.D.'s best interests. In determining the best interests of a child, the trial court must look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). "In so doing, the trial court must subordinate the interests of the parent to those of the child." *Id.* The court need not wait until a child is harmed irreversibly before terminating the parent-child relationship. *Id.* We have previously held that the recommendations of the case manager and court-appointed advocate, in addition to

17

evidence that the conditions resulting in removal will not be remedied, are sufficient to establish by clear and convincing evidence that termination is in the child's best interests. *Id*.

Here, family case manager Harris testified that she believed that termination of Mother's parental rights is in D.D.'s best interests. Harris noted that Mother failed to participate in and/or complete many of the DCS service referrals and recommended treatments. Mother was twice referred for a substance abuse evaluation, but she failed to attend. She participated in only one drug screen, during which she tested positive for THC and cocaine. The record indicates that despite being diagnosed with bipolar and major depression disorder, Mother failed to follow up with all recommended treatment. Harris opined that Mother could not provide a safe and stable home environment for D.D. due to her failure to address her mental health and substance abuse issues. Harris also testified that Mother failed to consistently visit with D.D. As noted earlier, the record indicates that visits were suspended due to Mother's inconsistent attendance and due to inappropriate conversations Mother had with D.D. Harris testified that D.D.'s anxiety appeared to have greatly improved while in her preadoptive foster home and that, due to her reactive attachment disorder, she needed the stability and permanency of adoption as soon as possible.

Similarly, guardian ad litem Cavanaugh also opined that termination of Mother's parental rights was in D.D.'s best interests. Cavanaugh stated that Mother scheduled two occasions when Cavanaugh could visit her home to see if it was safe for D.D., but Mother was not home or failed to answer the door on both occasions. Cavanaugh specifically

18

noted Mother's lack of progress and unwillingness to complete DCS services and her repeated failures to demonstrate that she could provide a permanent and safe home for D.D. After discussing why reunification was no longer a viable goal and that termination of Mother's parental rights is in D.D.'s best interests, Cavanaugh opined, "[W]e have had four permanency hearings on this case and we are not where we need to be … the longer this takes the more I think that is going to be a hardship on [D.D.]" Tr. at 263-64. Cavanaugh explained that D.D. has bonded with her foster family and that the permanency of adoption is in D.D.'s best interests.

This case is a prime example of when the court need not wait until the children are harmed irreversibly before terminating the parent-child relationship. *See J.S.*, 906 N.E.2d at 236. D.D. has been removed from Mother's care for almost three years. As our supreme court recently reiterated, children have a paramount need for permanency and cannot wait indefinitely for their parents to work toward preservation or reunification. *In re E.M.*, 4 N.E.3d 636, 647-48 (Ind. 2014). In light of the testimony of case manager Harris and guardian ad litem Cavanaugh, coupled with Mother's failure to complete services and lack of interest in consistently visiting with D.D., we cannot say that the trial court's conclusion that termination of Mother's parental rights is in D.D.'s best interests is clearly erroneous.

## Section 4 – Satisfactory Plan

Mother challenges the trial court's conclusion that there is a satisfactory plan for D.D.'s care and treatment, that plan being adoption. Particularly, Mother asserts that "DCS's plan for adoption is inappropriate" because DCS failed to meet its burden to

establish a reasonable probability that the conditions resulting in D.D.'s placement outside the home will not be remedied or that continuation of the parent-child relationship poses a threat to D.D.'s well-being. Mother's Br. at 26. Mother also argues that "D.D. did not exhibit any psychological problems prior to being placed in foster care," and therefore, "while her physical needs may have been met in foster care, her psychological needs have not been." *Id*. at 27.

As we have already addressed, DCS presented clear and convincing evidence that there is a reasonable probability that the conditions resulting in D.D.'s continued placement outside Mother's care will not be remedied. The remainder of Mother's argument on this issue is merely an invitation for us to reweigh the evidence in her favor regarding D.D.'s best interests, which we cannot do. *See D.B.*, 942 N.E.2d at 871. In order for the trial court to terminate the parent-child relationship, the court must find that there is a satisfactory plan for the care and treatment of the child. *S.L.H.S.,* 885 N.E.2d at 618. This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *Id.* Here, the evidence is sufficient to support the trial court's conclusion that DCS has a satisfactory plan for the care and treatment of the children, namely, adoption. *See id.*

In sum, the trial court did not abuse its discretion when it sustained DCS's objections on relevancy grounds to Mother's attempts to elicit certain testimony from witnesses. The trial court did not clearly err when it concluded that: (1) there is a reasonable probability that the conditions that resulted in D.D.'s removal and continued placement outside the care of both Mother and Father will not be remedied; (2) that

20

termination of Mother's parental rights is in D.D.'s best interests; and, (3) DCS has a satisfactory plan for the care and treatment of D.D., which is adoption. Accordingly, we affirm the trial court's decision to terminate both Mother's and Father's parental rights to D.D.

Affirmed.

RILEY, J., and MATHIAS, J., concur.